UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                        )
KEVIN R. KELLY,                         )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )      Civil Action No. 05-900 (PLF)
                                        )
KAREN G. MILLS, Administrator, United States   )
        Small Business Administration,  )
                                        )
        Defendant.¹                     )
_____ )
```

_____

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

        This matter came before the Court for a four-day bench trial on plaintiff Kevin

Kelly's claim that his employer, the United States Small Business Administration ("SBA"),

discriminated against him on account of his race and retaliated against him for pursuing past

claims of discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as

amended, 42 U.S.C. §§ 2000e *et seq.*  The Court previously dismissed without prejudice three

claims in plaintiff's first amended complaint, see Kelly v. Barreto, Civil Action No. 05-900,

Order at 1 (D.D.C. Sept. 5, 2006); Opinion at 6-9 (D.D.C. Sept. 5, 2006), and granted

defendant's motion for summary judgment on plaintiff's age discrimination claim under the Age

Discrimination in Employment Act.  See Kelly v. Hairston, 605 F. Supp. 2d 175 (D.D.C. 2009).

The one issue that remained for trial concerns plaintiff's claims of race discrimination and

retaliation in violation of Title VII.

_____

        [1]        The Court has substituted Administrator Karen Mills as the defendant in place of
former Administrator Hector V. Barreto and former Acting Administrator Darryl Hairston
pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

# I.  FINDINGS OF FACT

The facts in this case revolve around plaintiff's employment at the SBA from September 1998 to May 2004, and primarily from 2001 until his termination on June 1, 2004. Plaintiff's race discrimination claim alleges that his supervisor, Leo Sanchez, treated him differently from a similarly situated Hispanic employee, Jorge Rivera.  Plaintiff's retaliation claim alleges that he was placed on a Performance Improvement Plan ("PIP") and later terminated for engaging in protected activity.  Upon careful consideration and evaluation of the testimony of all the witnesses and the documentary evidence admitted at trial, and making credibility findings as necessary and appropriate to resolve any material discrepancies in the testimony, the Court makes the following findings of fact.[2]

## A.  General Background

Kevin Kelly, an African-American male, began working at the SBA in September 1998 as a GS-11 Business Opportunity Specialist ("BOS") in the Office of Small Disadvantaged Business Certification and Eligibility ("SDB office").[3]  Mr. Kelly's duties as a BOS included

---

[2]     The following witnesses testified at trial: Kevin Kelly, Veronica Johnson, Tracy Ebb-Murphy, Eugene Cornelius, Jr., David King, Leo Sanchez, and Napoleon Avery.  The Court has carefully considered all the evidence presented by the parties at trial but does not discuss in this Opinion all the evidence it ultimately found unpersuasive or immaterial to the outcome.

[3]     The SDB office was previously referred to as the Office of Minority Employment Development prior to an agency reorganization in 2001.

screening and analyzing applications from small businesses to determine whether they were

eligible for certification under the Small Disadvantaged Business ("SDB") program.[4]

In making certification recommendations for the SDB program, BOSs followed a two-

step process.  First, a BOS "screened" applications to ensure that they contained all information

necessary for the review process.  Under agency regulations, the screening period was to be

completed within 15 days.  If a BOS determined that the application was missing required

information, he or she could either return the application with a letter explaining the deficiencies

or mark it as pending and contact the applicant directly to request additional information.

Because missing information inevitably delayed the review process, a BOS typically imposed a

deadline by which the applicant was required to submit the required information if this second

option was chosen.

Second, a BOS "processed" applications by evaluating whether the businesses

satisfied the six eligibility criteria for the SDB program.  After reviewing the application, a BOS

submitted a written recommendation to a supervisor which included an evaluation of each of the

six criteria.  Agency regulations required that the processing period be completed within 60 days,

setting an overall 75-day deadline from the receipt of the application for the BOSs to complete

---

[4]      The SDB program certified eligible businesses for contract work with the federal
government by evaluating six criteria: (1) whether the applicant possessed at least 51%
ownership interest in the business; (2) whether the applicant managed and controlled the business
by handling daily business operations; (3) whether the business fell within the size standards
established by the SBA with respect to gross annual receipts or number of employees;
(4) whether the applicant was socially disadvantaged; (5) whether the applicant was
economically disadvantaged; and (6) whether the applicant was a U.S. citizen.

their review.  Because of the often substantial number of applications submitted to the SDB

program, supervisors permitted BOSs to work on applications beyond the 75-day period.

The SBA utilized a computerized tracking system to monitor the progress of

applications.  One of the items tracked by the system was the number of days it took for a BOS to

review a case.  Supervisors used this information to determine whether a BOS met the 75-day

deadline or exceeded it (and by how many days) and to evaluate an employee's job performance.

Mr. Kelly testified that the SDB tracking system was error-prone and frequently reported

inaccurate data.  For example, he said the system occasionally displayed an incorrect number of

days that he had worked on an application or reported that an application was still pending that

he had already completed.  Mr. Kelly, as well as other BOSs, brought this error to the attention of

their supervisors.  <u>See</u> Plaintiff's Exhibit ("PX") 1.[5]  Plaintiff's witness, Tracy Ebb-Murphy,

similarly testified to the data reporting problems with the tracking system.[6]

In 2001, the SBA underwent a reorganization which reduced the number of BOSs

from approximately 60 to 10 or 12 and eliminated all clerical staff.[7]  This shifted many

administrative responsibilities to BOSs, including staffing the help desk to respond to applicant

inquiries.  Several witnesses testified that all BOSs received inquiries from applicants.  Around

2003, the SBA hired temporary employees to staff the help desk.

_____

[5]      "PX" refers to plaintiff's exhibits; "DX" refers to defendant's.

[6]      Ms. Ebb-Murphy worked as a BOS during the same time period that Mr. Kelly
was employed at the SBA, 1998 through 2004.

[7]      Several witnesses, including Mr. King and Mr. Sanchez, testified that an
overwhelming number of BOSs in the SDB office were African-American, both before and after
the reorganization in 2001.  Indeed, Mr. King testified that when he left the SDB office in
February 2002, 15 of 17 BOSs were African-American.

Because of the staff reductions, Mr. Kelly testified that his workload, along with the workloads of all remaining employees, increased substantially.  Several witnesses testified that with fewer BOSs to screen and process applications, the reorganization created a substantial backlog of applications needing to be reviewed.  In a June 17, 2003 email to a field supervisor, Leo Sanchez, Mr. Kelly's supervisor in the SDB office during most of the relevant time period, described the backlog in the following way: "[S]ince the program office went from nearly 60 staff members and 9 managers to 11 staff members and me we fight a losing battle each and every day . . .  It just doesn't make sense to reassign cases to remaining staff members who themselves are all already overloaded."  See PX 4.

In March 2003, Eugene Cornelius, an African-American male, was assigned to the SDB office as an associate administrator and was charged with reducing the backlog.  Mr. Cornelius served as Mr. Kelly's third-line supervisor.  Beginning in approximately November 2003, he asked Mr. Kelly to submit weekly progress reports to him.

### B.  Mr. Kelly's Performance Evaluations in 1999 and 2000

In November 1999, Mr. Kelly received a performance evaluation for fiscal year ("FY") 1999 from his first-line supervisor, Leo Sanchez, a Hispanic male.  See PX 2.  Mr. Kelly received a rating of "4" on a 5-point scale.  See id. at 1.  This rating corresponds to a performance which "Exceeds Fully Successful," one step below "Outstanding."  Id. at 3.  Mr. Sanchez noted in his justification of the rating that Mr. Kelly had "processed approximately 25 cases for the year" and had "provided outstanding customer service."  Id.  Mr. Sanchez also recommended Mr. Kelly for a promotion to GS-12 status, effective October 26, 1999.  See id.

5

Mr. Kelly again received a rating of "4," "Exceeds Fully Successful," on his

performance evaluation from Mr. Sanchez for FY 2000.  See PX 3.  Mr. Sanchez noted in his

justification that Mr. Kelly had "processed approximately 19 cases for the year, however, many

have involved complex social or economic issues."  Id. at 2.  Mr. Sanchez also reported that Mr.

Kelly had acted as a "[t]eam [l]eader" and that "his peers rely on him for assistance in case

analysis and thinking through the certification evaluation process."  Id.

### C.  Mr. King's SDB Detail, December 2000 through February 2002

In December 2000, David King, then an attorney advisor in the SBA Office of

Procurement, was detailed to the SDB office until February 2002.[8]  Mr. King, an African-

American male, advised the office on complex eligibility issues.  Eventually, Mr. King assisted

in reviewing employee work and conducting performance evaluations.

The Court heard conflicting testimony from Mr. Kelly and Mr. King concerning

several minor facts.  First, Mr. Kelly testified that Mr. King asked him to take on additional job

responsibilities.  Mr. Kelly declined to do so because he feared resentment from his co-workers

and because Mr. King could not offer additional compensation or a promotion.  Mr. King denied

that he ever asked Mr. Kelly to assume additional responsibility.  Second, Mr. Kelly claimed that

he was routinely assigned more complex cases than other BOSs and that these cases took longer

---

[8]      Mr. Kelly testified that Mr. King replaced Mr. Sanchez as his official supervisor
from October through December 2000.  Mr. King testified, however, that his detail in the SDB
office did not begin until December 2000.  To the extent that it is relevant to plaintiff's claim, the
Court credits the testimony of Mr. King with the respect to the dates of his detail because it
presumes that he would have the most accurate recollection of when he began working in the
SDB office.  Moreover, Mr. King testified that during his SDB detail, he never replaced Mr.
Sanchez as Mr. Kelly's supervisor but rather that they jointly supervised Mr. Kelly.  The Court
need not resolve this factual discrepancy because it is immaterial to its analysis.

to screen and process.  Mr. King also denied this.  To the extent that these factual discrepancies

are relevant to its analysis, the Court credits the testimony of Mr. King.

        Mr. King served as the rating official for Mr. Kelly's performance evaluation for

FY 2001.  See PX 5.  Mr. King and Mr. Kelly met on November 9, 2001 to discuss the

evaluation.  Mr. Kelly received a rating of "3" on a 5-point scale which corresponds to a "Fully

Successful" performance.  Id.[9]  Although no written justification for this rating accompanied the

evaluation, Mr. King testified that the rating reflected his observation that Mr. Kelly's work was

increasingly tardy and that he failed to review applications by the regulatory deadlines.  Mr.

Kelly refused to sign the evaluation.  After this review, Mr. Kelly began to believe that Mr. King

was retaliating against him for refusing to accept additional responsibility.  Soon thereafter, he

spoke to an EEO counselor and ultimately decided to file a union grievance against Mr. King on

January 1, 2002.  See PX 27A.[10]

---

      [9]      To be precise, Mr. Kelly received a "3.2" rating on his FY 2001 performance
evaluation, which was the average of five critical elements ratings.  See PX 5 at 1.  His "3.2 "
rating was rounded down to a "3" pursuant to the summary rating definitions that were included
in the performance evaluation document.  See, e.g., PX 3 at 3.

      [10]     In his grievance, Mr. Kelly alleged that Mr. King's failure to comply with certain
procedures established by the union contract constituted a violation of the agreement.
Specifically, he claimed in an "SBA/AFGE Grievance Form," dated January 1, 2002, that Mr.
King failed to give him notification of the performance deficiencies which justified the lower
rating.  See PX 27A.  In his testimony, Mr. Kelly further asserted that Mr. King signed his
performance evaluation two days after the reviewing official, Josephine Stallings, signed the
evaluation; Mr. Kelly said this violated procedures outlined in the union contract.  Mr. King
explained in his testimony that his policy was to sign the evaluation while discussing it during his
meetings with employees, which necessarily occurred after he presented the ratings to Ms.
Stallings and obtained her signature.

### D.  Mr. Kelly's Claims of Disparate Treatment

Mr. Kelly testified that during the course of his employment at the SBA, Mr. Sanchez treated him differently from his co-worker, Jorge Rivera, who also worked as a BOS in the SDB Office.  Like Mr. Sanchez, Mr. Rivera is a Hispanic, Spanish-speaking male.

At trial, Mr. Kelly offered evidence he claims shows that Mr. Sanchez favored Mr. Rivera.  For example, on October 20, 2002, Mr. Kelly received a performance evaluation in which Mr. Sanchez, who had resumed responsibility as his rating official, gave him a rating of a "2."  See PX 7.[11]  This rating corresponds to a "Minimally Successful" performance.  Id. at 1. Mr. Sanchez's written justification noted: "[Mr.] Kelly screened approximately 200 cases (within the average range for all staff members).  However, his average time to screen cases was 40 days. Twenty-five days over the regulatory requirements [].  And well over the office average.  The office average was about 13 days which is within the regulatory time frame."  Id. at 2.  Mr. Sanchez further noted that Mr. Kelly processed 66 cases for the year, which was within the office average, but that when his screening and processing averages were added together, Mr. Kelly retained the cases at his desk for a total of 106 days, well beyond the 75-day deadline.  Id.  Mr. Sanchez also observed that he had previously removed Mr. Kelly from the list of BOSs receiving new cases with the goal that doing so "may help him get up to speed."  Id.  By the end of the rating period, however, Mr. Kelly still had not completed 20 cases.  Finally, Mr. Sanchez indicated that Mr. Kelly "had consistently been untimely [and] unresponsive and [had]

---

[11]      Mr. Kelly's precise rating was a 2.4, which was the average of five critical elements.  This number was rounded down to a 2 pursuant to the rating summary definitions. See, e.g., PX 3 at 3.

chronically missed deadlines" and that his written work "consistently had syntax and grammatical errors." Id.[12]

Mr. Kelly attached a written statement to his evaluation for FY 2002, in which he expressed disagreement with the rating. See PX 7 at 3. He explained: "The rating does not reflect the complexity of the cases that I have completed . . . One compelling fact which had a profound affect [sic] and impact on my performance rating(s) is the fact that our office has decreased in staff numbers." Id.

Mr. Kelly offered into evidence the performance evaluations of two other BOSs for the same time period, Mr. Rivera and Barbara Seldon-Dotson.[13] Mr. Sanchez rated Mr. Rivera's performance as "Exceeds Fully Successful" and noted that he "processed 85 cases for the year with an average of 29 days" and "screened 152 cases returning 47 percent of the cases that he reviewed in an average of a record 4 days." See PX 8 at 1. In Ms. Seldon-Dotson's evaluation, Mr. Sanchez rated her performance as "Outstanding" and noted that she "processed 80 cases for the year in an average for 23 days" and "screened approximately 180 cases for the year." See id. at 2.

Mr. Kelly received a rating of "2.4" ("Minimally Successful") on a mid-year performance evaluation given on June 11, 2003. See PX 11. As set forth in greater detail below, this evaluation eventually led to his placement on a Performance Improvement Plan ("PIP"). As evidence of retaliation, Mr. Kelly offered the performance evaluations of other BOSs for FY

---

[12]     Eugene Cornelius testified that a BOS's written work product is "critical"; it is 90% of what reviewers consider in making performance determinations. Mr. Cornelius testified that Mr. Kelly's written reports were "substandard."

[13]     Barbara Seldon-Dotson is an African-American female.

2003, claiming that several other employees received  "Minimally Successful" ratings and were

not placed on a PIP.  See PX 22.[14]  These evaluations also show that Mr. Sanchez, as the rating

official, rated these employees at a higher level than the relevant guidelines instructed.[15]  Mr.

Kelly claims that Mr. Sanchez's failure to exercise his discretion to adjust Mr. Kelly's rating in a

similar way constitutes retaliation.

      Aside from the performance evaluations for FY 2002 and mid-year 2003, Mr.

Kelly relied on several pieces of anecdotal evidence to establish his claim that Mr. Sanchez

treated him differently from Mr. Rivera.  First, he testified — and no one disputed this, including

Mr. Sanchez — that Mr. Sanchez sometimes spoke to Mr. Rivera in Spanish, greeting him by

saying, "Buenos dias, mi hijo," which translates to "Good morning, my son."  He also called him

"amigo."  Furthermore, it is undisputed that when Mr. Sanchez had concerns about a case or had

received an inquiry from an applicant, he would follow-up with the BOS assigned to the case.

On occasion, Mr. Sanchez left handwritten notes for Mr. Rivera concerning his cases, see PX 6,

while Mr. Kelly claims that he received only email messages from Mr. Sanchez.[16]  Because Mr.

---

[14]      The Court notes that all of these employees are African-American.

[15]      For example, the "Guidelines for Timeliness of Review" instruct that an
employee's performance should be rated as a "3" or "Fully Successful" when "85-89% of the
assigned cases [are] completed and submitted for review . . . within 45 days of assignment date
and no case is completed more than 50 days after assignment."  See PX 12 at 5.  In a
performance evaluation for FY 2003, however, Mr. Sanchez gave an employee a "3" rating even
though she had processed only 22% of her cases within 45 days.  Id.  Mr. Sanchez similarly rated
another employee's performance a "3" when she completed only 33% of her cases within 45
days.  Id.  Mr. Sanchez explained in his testimony that in assigning ratings, he exercised
permissible discretion in calculating an office average and then rating employees based on where
they fell within that average range.

[16]     According to Mr. Kelly, the significance of handwritten notes is that they can be
easily disregarded and destroyed, whereas email messages build a permanent record of inquiries

Sanchez did not specifically address whether he left handwritten notes for anyone other than Mr.

Rivera, the Court credits the testimony of Mr. Kelly.

Along these same lines, Mr. Kelly testified that Mr. Sanchez invited Mr. Rivera

into his office on several occasions but did not extend the same invitation to Mr. Kelly.  Because

Mr. Sanchez did not specifically address this allegation, the Court again accepts Mr. Kelly's

testimony.  Mr. Kelly further testified that Mr. Sanchez occasionally "stopped the clock" on the

SDB tracking system for Mr. Rivera so that the passing time was not counted against the 75-day

deadline but did not do the same for him.  Mr. Sanchez did not address the allegation in his

testimony.  Other than his testimony, Mr. Kelly did not present any evidence that this occurred;

he offered no documentation, records or testimony from other employees to substantiate his

claim that Mr. Sanchez selectively stopped the clock.  It seems likely to the Court that if this

allegation were true, other evidence that it occurred would be available.  Therefore, even without

a statement from Mr. Sanchez contradicting the allegation, the Court rejects it because of the lack

of sufficient evidence in the record.

Finally, Mr. Kelly testified that he overheard Mr. Sanchez tell a contract worker

staffing the help desk that if there was a call from an applicant for Mr. Kelly, Mr. Sanchez

wanted to know about it.  Mr. Kelly was unaware of Mr. Sanchez asking for this information

about Mr. Rivera.  Mr. Sanchez did not address this allegation in his testimony, so the Court

accepts Mr. Kelly's allegation.  Because Mr. Sanchez explained that he had substantial concerns

about Mr. Kelly's job performance after the reorganization in 2001, however, the Court draws an

_____

and complaints, which can later be used to justify adverse employment actions.  Mr. Kelly could
not say for certain whether Mr. Rivera also received emails from Mr. Sanchez, in addition to the
handwritten notes.

inference that Mr. Sanchez asked for this information about Mr. Kelly in order to oversee and

better evaluate his work.

### E.  Mr. Kelly's Union Grievances

As a result of the FY 2002 evaluations, Mr. Kelly, along with five other SBA

employees, filed a class action union grievance against Mr. Sanchez on November 13, 2002.  See

PX 27B.  All six employees who filed the grievance worked as BOSs and were African-

American.  Mr. Kelly testified that he served as the class agent for this grievance but that the

actual grievance form was signed by another person, Jennifer Weston.  Id.  The grievance

claimed that "[n]o interim rating was provided as required by [the union contract]; nor were

critical elements in place as was stated in a meeting between [several employees and Mr.

Sanchez] in the union office on May 15, 2002."  Id.  The grievance also alleged that Mr. King did

not provide an interim rating for each SDB employee that he supervised before leaving the office.

Id.  Despite unsubstantiated claims from Mr. Kelly that Mr. Sanchez knew of the grievance and

his role in filing it, it remains unclear from the testimony when, if ever, Mr. Sanchez learned that

this complaint had been made against him.

The Performance Management Appraisal System standards ("PMAS standards")

for the SDB office, which were used to evaluate employee job performance, changed in

December 2002.  Mr. Sanchez met with Mr. Kelly on December 12, 2002, to explain the new

performance standards to him.  See DX 2.  Mr. Kelly refused to sign the paper acknowledging

that new standards were in effect and that he would be evaluated by them during his next

performance review.  Id.  On December 18, 2002, Mr. Kelly, along with seven other BOSs, sent

Mr. Sanchez a memo objecting to the proposed changes because employee input had not been solicited and asking for a meeting with him.  See PX 11 at 10-15.  Because Mr. Sanchez did not respond to this memo, the employees sent a similar memo via email to Hector Barreto, then the administrator of the SBA, and other managers, including Mr. Sanchez, on June 10, 2003.  See PX 10.

### F.  Mr. Kelly's Performance Improvement Plan

Mr. Sanchez testified that following the reorganization in 2001, he observed troubling changes in Mr. Kelly's job performance.  He testified that although the workload for all BOSs had increased substantially, Mr. Kelly struggled more than anyone else to respond to applicants in a timely fashion and to screen and process applications within the deadlines.  Mr. Sanchez testified that Mr. Kelly's performance rating of a "2" for FY 2002 reflects these concerns.  See PX 7.

From December 2002 to June 2003, Mr. Sanchez testified that his concerns about Mr. Kelly had grown so severe that he spoke to representatives from the SBA Office of Human Resources for guidance.  At this time, he provided examples to Human Resources of Mr. Kelly's lateness in reviewing cases and responding to customers.  See DX 3B.  Human Resources advised Mr. Sanchez to place Mr. Kelly on a Performance Improvement Plan ("PIP").  David King and Eugene Cornelius, who were familiar with Mr. Kelly's work during this time, testified that they shared Mr. Sanchez's concerns about Mr. Kelly's poor job performance and supported the decision to implement the PIP.

On June 11, 2003, Mr. Kelly met with Mr. Sanchez for his mid-year performance review.  Mr. Kelly testified that he and Mr. Sanchez primarily discussed Mr. Kelly's objection to the new PMAS standards and his belief that changing them without input from the employees violated the union contract.  Mr. Sanchez testified that they discussed Mr. Kelly's deteriorating performance, the decision to place Mr. Kelly on the PIP, and the reasons for implementing the PIP.  Mr. Kelly refused to sign the performance evaluation discussed at the meeting, instead writing in the space for his signature: "because of the supervisor's refusal to address the attached (Dec. 18, 2002) PMAS concerns, it is in my best interest not to sign this PMAS handed to me today with the supervisor stating our meeting today is for your mid-year review."  See PX 11 at 1.  Mr. Sanchez wrote on the evaluation: "Staff member put on PIP 11 Jun 2003."  Id.

Mr. Kelly claims that there was no discussion of the PIP at the June 11 meeting and that he first learned of the PIP 15 days after this meeting, on June 26, 2003, when he discovered a copy of the performance evaluation on his desk.[17]  He testified that the performance evaluation on his desk differed from the one he remembered from his meeting, however, because it contained Mr. Sanchez's notation about the PIP.  On June 26, 2003, Mr. Kelly filed another union grievance against Mr. Sanchez, claiming that he "was never served with a copy of why" the PIP had been imposed.  See PX 27C.

On July 3, 2003, after Mr. Sanchez informed the Office of Human Resources that Mr. Kelly claimed he had not received the PIP during their meeting, Human Resources faxed Mr.

---

[17]    In her closing argument, counsel for Mr. Kelly suggested that the fact that he did not learn about the PIP until June 26, 2003, demonstrates that Mr. Sanchez backdated the PIP letter after learning of Mr. Kelly's contact with an EEO Counselor on June 5, 2003.  Because there is absolutely no evidence in the record to support this allegation, however, the Court rejects it.

Kelly a copy of the PIP, stamped and dated June 11, 2003.  See PX 13.  The letter explained the

reasons for Mr. Kelly's PIP placement and identified areas in which Mr. Kelly needed to improve

his job performance in order to avoid "reassignment, reduction in grade or removal from the

Federal Service."  Id. at 5.

 The letter set forth in detail the reasons for the PIP placement.  Specifically, Mr.

Kelly was being placed on a PIP because his average screening time of 72 days was 63% below

the national average of 44 days.  See PX 13.  The letter also noted that Mr. Kelly had failed to

process 41 cases within the applicable time frame and summarized complaints from several

clients that Mr. Kelly had not responded to repeated inquiries into the status of their applications.

Id.[18]

 According to the letter, the terms of the PIP can be summarized as follows: (1) the

PIP would last for 120 days and the performance requirements had been prorated to reflect the

fact that its duration was less than a full year; (2) during that time period, there could be no more

than two instances when Mr. Kelly's work required supervisory intervention for incomplete or

inaccurate information, failure to update and maintain accurate information in the SDB database,

or failure to meet regulatory deadlines or those imposed by supervisors; (3) with respect to

screening of applications, Mr. Kelly could have no more than two instances when he did not

communicate to a client the status of a case and supervisory intervention was required or failed to

review and forward applications within the regulatory time frame without adequate justification;

---

[18]  According to the PIP letter, one applicant wrote an email to Mr. Sanchez
indicating that he had left 14 messages for Mr. Kelly that had never been returned.  Another
applicant said he had contacted Mr. Kelly approximately two dozen times with no response.  See
PX 13 at 2.

(4) with respect to processing applications, Mr. Kelly could have no more than two instances when applications were processed outside the time frame or supervisory intervention was required to take over the analysis; and (5) Mr. Kelly must complete 80 to 84% of assigned cases within 45 calendar days and no case could be completed more than 50 days after assignment. See PX 13.  The letter also indicated that Mr. Sanchez would meet with Mr. Kelly bi-weekly during the PIP period to discuss his progress.  Id. at 4.  Although the PIP went into effect on June 11, 2003, the first such meeting did not occur until August 6, 2003.

*G.  Mr. Kelly's EEO Activity*

Prior to his meeting with Mr. Sanchez on June 11, 2003, Mr. Kelly contacted EEO Counselor Wanda Clock on June 5, 2003.  He testified that he did so as the spokesperson for a class of African-American BOSs.  Mr. Kelly also testified that when he later met with Ms. Clock he told her that he planned to file an individual EEO complaint against Mr. Sanchez for his PIP placement, which he believed to be in retaliation for his union grievances.  After an initial interview with Mr. Kelly on June 26, 2003, Ms. Clock wrote an EEO Counselor's Report summarizing the details of Mr. Kelly's individual complaint and of the class complaint, which included allegations of racial discrimination and retaliation for filing a union grievance.  See PX 9.[19]  Mr. Sanchez and Josephine Stallings were named as the "principal responding officials" in the complaint.  Ms. Clock met with them on August 13, 2003, to discuss the allegations.

The EEO class complaint was officially filed on October 7, 2003.  See PX 29. Mr. Kelly's individual EEO complaint was officially filed on October 8, 2003.  See PX 30.  Mr.

---

[19]    Ms. Clock's summary indicated that the class specifically alleged that they were "treated differently than a Hispanic employee in the office."  See PX 9.

Kelly amended his complaint on October 16, 2003, to include a retaliation claim alleging that

Mr. Sanchez sent him a letter of reprimand while he was away from work on medical leave.  Id.

  Mr. Sanchez testified that when he met with Mr. Kelly on June 11, 2003, he was

unaware of the fact that Mr. Kelly had contacted an EEO Counselor on June 5, 2003.  He also

said that while he cannot specifically recall when he learned of the EEO complaint filed against

him, it was *after* he placed Mr. Kelly on a PIP on June 11, 2003.  The Court accepts the

testimony of Mr. Sanchez that he did not learn of Mr. Kelly's EEO activity until after June 11,

2003, the date that Mr. Sanchez testified that he implemented the PIP, and in fact may not have

learned about it until just before he met with Ms. Clock on August 13, 2003.

### H.  Meeting on August 6, 2003, Between Mr. Sanchez, Mr. Kelly, and Ms. Johnson

  Mr. Sanchez scheduled the first PIP meeting on August 6, 2003.  Mr. Kelly

invited his union steward, Veronica Johnson, to attend the meeting with him.  When Ms. Johnson

informed Mr. Sanchez of her planned attendance in an email, Mr. Sanchez advised her that the

union contract did not entitle Mr. Kelly to a union representative at meetings concerning

employee performance.  See PX 14.  Because Ms. Johnson disagreed with this interpretation of

the contract, she informed Mr. Sanchez that she still would attend.  Id.  When Mr. Kelly and Ms.

Johnson arrived at Mr. Sanchez's office on August 6, 2003, Mr. Sanchez shouted at her to leave,

shouted at Mr. Kelly, and demanded that he sit down.  According to Ms. Johnson, Mr. Sanchez

"went ballistic."  This behavior caused Mr. Kelly to have a physical reaction during which he felt

stomach and head pains and his breathing became difficult, making him fearful he was having a

heart attack.  Mr. Kelly was taken to a hospital immediately after this incident and he was

released later that evening.  See PX 26.[20]

### I.  Mr. Kelly's Medical Leave, August 6, 2003 through November 4, 2003

Mr. Kelly was on medical leave from the SBA from August 6, 2003, until

November 4, 2003.  During this time, he was under medical care.  See PX 26.  During Mr.

Kelly's leave, Mr. Sanchez sent a letter to his home inquiring about the location of 32 cases that

had been previously assigned to Mr. Kelly.  Mr. Kelly testified that he did not respond because

he had been advised by a doctor to avoid stressful situations.  Mr. Sanchez later sent a letter of

reprimand to Mr. Kelly for failing to respond.

Mr. Kelly returned to work at the SBA on November 4, 2003, and learned that his

PIP had been extended until February 5, 2004.  During this time period, none of his supervisors

informed him that he was failing the PIP.  Mr. Sanchez testified that he evaluated Mr. Kelly's

performance at the end of the extended PIP period and determined that there had been no

improvement.  Mr. Sanchez testified that he conferred with the Office of Human Resources in

February 2004 and discussed his proposal to terminate Mr. Kelly's employment.

Mr. Kelly also testified that after he returned from medical leave, he was

prevented from participating in an elective training opportunity for BOSs.  Mr. Cornelius, who

organized the training, said that although Mr. Kelly never signed up for the training in advance

(as was required) and had not reserved a space in the van driving to the training, he offered Mr.

---

[20]     Mr. Sanchez testified that he only raised his voice at the meeting. The Court finds
the difference between the two characterizations of his behavior irrelevant because it credits Mr.
Kelly's testimony about the physical and emotional reaction he had that day.

Kelly the option of driving his own car and being reimbursed for gas.  Mr. Kelly did not accept

this offer and did not attend the training.  The Court accepts Mr. Cornelius' testimony and finds

that Mr. Kelly was not prevented from attending the training opportunity.

*J.  Mr. Kelly's Termination*

On May 12, 2004, Mr. Sanchez gave Mr. Kelly a letter proposing his removal

from the federal service.  See PX 20.  The letter explained that Mr. Kelly failed to satisfy the PIP

requirements.  Specifically, Mr. Kelly had been assigned eight cases for processing during the

PIP period but had completed the processing of only one case.  Id.  He had also failed to screen at

least ten cases within the required 15-day deadline.  Id.  The letter also summarized complaints

from seven customers, concerning Mr. Kelly's failure to respond to their inquiries in a timely

fashion.  Id.

Mr. Kelly appealed this decision to Mr. King, who was the deciding official in the

action.  Mr. King had returned to the SDB office in October 2002 for a second detail.  Mr. King

testified that after carefully considering the appeal, which mostly consisted of procedural

challenges to the termination, he supported the decision to terminate Mr. Kelly's employment.

Mr. King composed another letter to Mr. Kelly explaining his decision to uphold the termination,

which identified Mr. Kelly's poor job performance in terms of screening and processing

applications within the regulations as the reason for his termination.  See DX 6.  That letter was

sent to Mr. Kelly on June 1, 2004.

## II.  CONCLUSIONS OF LAW

### A.  Plaintiff's Discrimination Claim

Title VII provides, in pertinent part, that "[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16. It is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Title VII also makes it unlawful for an employer to retaliate against an employee for engaging in protected activity such as filing a charge of discrimination.  See 42 U.S.C. § 2000e-3(a); see also Holcomb v. Powell, 433 F.3d 889, 901 (D.C. Cir. 2006).

Absent direct evidence that an employment-related decision was discriminatory or retaliatory, the claims must be analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009); Moncada v. Peters, 579 F. Supp. 2d 46, 53 (D.D.C. 2008) (citing Barnette v. Chertoff, 453 F.3d 513, 515 (D.C. Cir. 2006)).  Traditionally, within that framework, a plaintiff must first establish a *prima facie* case of discrimination or retaliation.  See Moncada v. Peters, 579 F. Supp. 2d at 53 (citing Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1149 (D.C. Cir. 2004)).  "Doing so creates a rebuttable presumption of discrimination [or retaliation] and 'triggers the employer's burden to produce admissible evidence that, if believed, would establish that the employer's action was motivated by a legitimate, nondiscriminatory [or nonretaliatory]

20

reason.'"  Moncada v. Peters, 579 F. Supp. 2d at 53 (quoting Teneyck v. Omni Shoreham Hotel,

365 F.3d at 1151).

        Recently, the United States Court of Appeals for the District of Columbia Circuit

made clear that the question whether the plaintiff in a disparate treatment discrimination suit

actually made out a prima facie case "is almost always irrelevant" on an employer's motion for

summary judgment or judgment as a matter of law or, in a case like this one, at the trial stage.  See

Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 492, 494 (D.C. Cir. 2008) (citing St.

Mary's Honor Society v. Hicks, 509 U.S. 502, 514-15 (1993); U.S. Postal Service Board of

Governors v. Aikens, 460 U.S. 711, 716 (1983)).  Once the employer has submitted admissible

evidence of a legitimate, non-discriminatory reason, the only question is whether "the employee

produced sufficient evidence for a reasonable jury to find that the employer's asserted non-

discriminatory reason was not the actual reason and that the employer intentionally discriminated

against the employee on the basis of race, color, religion, sex, or national origin[.]"  Id. at 494.

Nevertheless, in determining whether a plaintiff has shown that defendant's proffered reason for

its adverse action against the employee is pretextual, the strength of plaintiff's prima facie case

remains a relevant consideration.  See Jones v. Bernanke, 557 F.3d at 679 ("[T]he court reviews

each of the three relevant categories of evidence — prima facie, pretext, and any other — to

determine whether they 'either separately or in combination' provide sufficient evidence for a

reasonable jury to infer [discrimination or] retaliation.") (citing Waterhouse v. District of

Columbia, 298 F.3d 989, 996 (D.C. Cir. 2002).  With this framework in mind, the Court will now

turn to plaintiff's claims of discrimination.

1.  Asserted Adverse Actions

"While <u>Brady</u> directs the . . . focus to the employer's proffered non-discriminatory reason," at trial the factfinder "still first must determine whether plaintiff has suffered an adverse employment action." <u>Adesalu v. Copps</u>, 606 F. Supp. 2d 97, 103 (D.D.C. 2007) (citing <u>Brady v. Office of the Sergeant at Arms</u>, 520 F.3d at 494).  "An 'adverse employment action' [under Title VII] is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" <u>Douglas v. Donovan</u>, 559 F.3d 549, 552 (D.C. Cir. 2009) (citing <u>Taylor v. Small</u>, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  To show that he suffered from an adverse employment action, "[a]n employee must [have] 'experience[d] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" <u>Id</u>. (quoting <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1131 (D.C. Cir. 2006)).  "[N]ot everything that makes an employee unhappy is an actionable adverse action." <u>Russell v. Principi</u>, 257 F.3d 815, 818 (D.C. Cir. 2001).

Plaintiff argues that the following events constitute adverse employment actions: (1) Mr. Sanchez spoke Spanish to Mr. Rivera and not to Mr. Kelly; (2) Mr. Sanchez left handwritten notes for Mr. Rivera and not for Mr. Kelly; (3) Mr. Sanchez invited Mr. Rivera into his office and not Mr. Kelly; (4) Mr. Sanchez gave Mr. Kelly a lower performance rating than he gave Mr. Rivera for FY 2002, even though Mr. Kelly screened 48 more cases than Mr. Rivera did; (5) Mr. Sanchez placed Mr. Kelly on a PIP on June 11, 2003; and (6) Mr. Kelly was terminated from his employment at the SBA in May 2004.

As to plaintiff's arguments that Mr. Sanchez spoke Spanish to Mr. Rivera, invited

him to his office, and left him handwritten notes, the Court concludes that these events are not

adverse employment actions because there was no "significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities," nor did they cause a "significant change in benefits." Douglas v. Donovan, 559

F.3d at 552.  Plaintiff may have preferred a supervisor with a more affectionate or inclusive

management style, but he has not provided the Court with an explanation of how any or all of

these events constituted a "significant change in employment status" or had "any effect on [the]

salary, benefits, or grade" of his employment responsibilities or future employment opportunities.

Blackmon-Malloy v. United States Capital Police Bd., 338 F. Supp. 2d 97, 106 (D.D.C. 2004).

As the Supreme Court has reminded, Title VII "does not set forth 'a general civility code for the

American workplace.'"  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)

(quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79 (1998).  Even an

employee who reports discriminatory behavior is not immunized "from those petty slights or

minor annoyances that often take place at work and that all employees experience."  Id. at 68.

Without more of a showing from plaintiff, the Court concludes that these events do not constitute

adverse employment actions for purposes of his discrimination claim.

Though more serious, Mr. Kelly's complaint that his FY 2002 performance

evaluation constituted an adverse employment action also fails.  Poor performance evaluations by

themselves, though undesirable, are not adverse employment actions unless they "affect [] the

[employee's] grade or salary."  Brown v. Brody, 199 F.3d 446, 457-58 (D.C. Cir. 1999); see also

Douglas v. Donovan, 559 F.3d at 552; Taylor v. Small, 350 F.3d at 1293.  While a negative

evaluation sometimes "may drastically limit an employee's chances for advancement," in other

cases it may be of no real consequence.  Russell v. Principi, 257 F.3d at 819.  Without a showing

that the evaluation had an effect on the "terms, conditions or privileges" of his employment,

plaintiff's negative performance evaluation does not amount to an adverse employment action.

Douglas v. Donovan, 559 F.3d at 552.  Moreover, the fact that Mr. Rivera received a higher

rating than plaintiff for FY 2002, even though he screened fewer cases than plaintiff did, does not

transform the evaluation itself into an adverse employment action.  While it is true that plaintiff

screened 28 more cases than Mr. Rivera did, it took Mr. Kelly 40 days to do so, whereas it took

Mr. Rivera an average of only 4 days.  See PX 8.  Similarly, plaintiff processed only 66 cases

during the review period, whereas Mr. Rivera processed 85 cases.  Id.  On the evidence

presented, the Court concludes that the difference in performance evaluations between Mr. Kelly

and Mr. Rivera does not amount to an adverse employment action.[21]

   Nor does placing plaintiff on a PIP constitute an adverse employment action.  The

PIP placement itself had no effect on the terms or conditions of Mr. Kelly's employment and thus

was not "materially adverse" because it did not cause a "significant change in employment

status." Douglas v. Donovan, 559 F.3d at 552; see also Taylor v. Small, 350 F.3d at 1293 (PIP

not an adverse employment action when plaintiff "did not present any evidence [that the PIP]

affected her grade or salary"); Na'im v. Clinton, 626 F. Supp. 2d 63, 78 (D.D.C. 2009) (attempts

to place plaintiff on PIP are not materially adverse actions for purposes of retaliation claim

---

[21]  If anything, the evaluations support the SBA's performance-based reason for placing plaintiff on a PIP and ultimately terminating his employment because they reveal that Mr. Kelly worked too slowly.

because "no evidence that they had any impact on plaintiff's employment"). While it is true that Mr. Kelly's failure to fulfill the requirements of the PIP eventually led to his termination, he has made no argument that the PIP placement itself caused him to suffer any significant change in his employment status.  Douglas v. Donovan, 559 F.3d at 552.

Termination from employment is undisputably an adverse employment action. The Court therefore turns next to defendant's asserted, non-discriminatory reasons for terminating Mr. Kelly.

## 2.  Asserted Non-Discriminatory Reasons for Termination

The SBA presented credible and persuasive evidence showing that plaintiff was placed on a PIP and ultimately terminated because of his unacceptable job performance.  To begin with, defendant presented evidence that Mr. Sanchez hired Mr. Kelly and numerous other African-American employees to work at the SBA.  At the beginning of Mr. Kelly's tenure in the SDB office, Mr. Sanchez gave him two positive performance evaluations and recommended his promotion to GS-12 status.  See PX 2; PX 3.  Although far from determinative, courts in this district have observed that an inference of nondiscrimination is appropriate when the same person who hired or promoted the employee later proposes that an adverse action be taken against him.  See Mianulli v. Potter, 634 F. Supp. 2d 90, 97 (D.D.C. 2009); Valles-Halle v. Center for Nonprofit Adv., 481 F. Supp. 2d 118, 151 (D.D.C. 2007); Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 12-13 (D.D.C. 2000).  Although plaintiff has presented evidence that Mr. Sanchez spoke to Mr. Rivera in Spanish and left him handwritten notes, this evidence is not sufficient to overcome this inference or to sustain plaintiff's claim of intentional

discrimination.  At issue in this case is not whether Mr. Sanchez should have treated plaintiff

more affectionately, but rather whether he violated Title VII by placing plaintiff on a PIP and

then terminating his employment.  Mr. Sanchez's behavior simply is not enough to discredit

defendant's performance-based explanation.

    The evidence supports defendant's assertion that after the reorganization in 2001,

Mr. Kelly was unable to satisfy the demands of his increased workload and performed the same

job at a level lower than his co-workers.  As an example of how his performance compared to

that of other BOSs, plaintiff's performance evaluation for FY 2002 shows that he worked much

slower than his colleagues: his average time to screen cases was 40 days compared to the office

average of 13 days.  See PX 7.  Moreover, many of the co-workers to whom plaintiff was

compared were also African-American and had participated in protected activity along with

plaintiff; yet they were not placed on a PIP or terminated.  As several witnesses testified, the

length of time it took for a BOS to screen and process a case was a critical consideration in

evaluating employee job performance because of the regulations requiring the SBA to complete

its work within 75 days.  Plaintiff's problems in meeting those deadlines directly contributed to

the SBA's substantial backlog and impaired its ability to assist small businesses, as evidenced by

numerous complaints received by customers who interacted with the plaintiff.  Plaintiff's claim

that the cases he was assigned involved more complex issues than those of his colleagues and

therefore took longer to process is not supported by the evidence.  His supervisors offered

credible testimony that the complexity of his caseload was substantially the same as — and at

times even less than — that of other employees.  Furthermore, unlike that of some of his

colleagues, plaintiff's written work product was replete with syntax and grammatical errors,

further justifying the "Minimally Successful" rating he received in 2002.  See PX 7.

The testimony of Mr. Sanchez, Mr. Cornelius and Mr. King also supports the

SBA's claim that these performance deficiencies continued throughout the next year as well.

The fact that Mr. Cornelius and Mr. King are both African-American, and therefore members of

the same protected class as plaintiff, weighs further against an inference of discrimination.  See

Washington v. Chao, 577 F. Supp. 2d 27, 42 n.8 (D.D.C. 2008); Hammond v. Chao, 383 F.

Supp. 2d 47, 58 n.1 (D.D.C. 2005).  In 2003, Mr. Sanchez expressed his concerns to

representatives of the Office of Human Resources, who agreed that Mr. Kelly's placement on a

PIP was the appropriate next step.  The evidence shows that plaintiff's performance still did not

improve during the PIP period.  Even though he was assigned fewer cases than his co-workers,

Mr. Kelly still had multiple overdue applications and failed to complete his work within the

deadlines.  Mr. Sanchez's recommendation to terminate plaintiff's employment was again

supported by Mr. King, Mr. Cornelius, and the Office of Human Resources.

Because defendant has offered a legitimate, non-discriminatory reason for the

adverse actions taken against plaintiff — namely, poor and deteriorating job performance — the

Court will next examine plaintiff's claim that the proffered reason is pretextual and should not be

believed.  To support his claim of pretext, plaintiff testified about several discrete events

concerning Mr. Rivera, a Hispanic employee, that he believes demonstrate race-based

discrimination.  As discussed supra at 10-11, to the extent that Mr. Sanchez treated Mr. Rivera

differently by speaking to him in Spanish, writing him notes and inviting him to his office, there

is no evidence to suggest that this behavior had anything to do with Mr. Kelly's race.  Similarly,

the fact that Mr. Rivera received a higher performance rating in 2002 even though he processed fewer cases is unpersuasive.  As the Court previously noted, the evaluation also indicated that Mr. Rivera processed cases much more quickly and screened more cases than plaintiff did.  See supra at 8-9.  In short, the events identified by plaintiff do not amount to "sufficient evidence" that the defendant's reason for placing him on a PIP or terminating him — poor job performance — was pretextual. See Brady v. Office of the Sergeant of Arms, 520 F.3d at 494.  The record simply does not support a finding that discriminatory animus was the reason for his PIP placement or termination.  Accordingly, plaintiff's race discrimination claim fails.

### B.  Plaintiff's Retaliation Claims

Plaintiff also claims that he was subject to retaliation in violation of Title VII for filing individual and class action charges of discrimination with the EEOC and for serving as the class representative in connection with the class charges.  To establish a prima facie case of retaliation, the plaintiff must show (1) "that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." Jones v. Bernanke, 557 F.3d at 677; see also Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006); Holcomb v. Powell, 433 F.3d at 901-02.  As described above, the same analytical framework set forth in Brady for discrimination claims applies to retaliation claims.  Taylor v. Solis, 571 F.3d 1313, 1320 n.12 (D.C. Cir. 2009); Jones v. Bernanke, 557 F.3d at 670.  Brady requires that the employer provide a legitimate, non-retaliatory reason for its adverse action.  See Brady v. Office of Sergeant of Arms, 520 F.3d at 494.  If the employer does so, the only question is retaliation vel non: whether the employee has produced sufficient evidence for a

factfinder to find the employer's asserted nonretaliatory reason was "not the actual reason and that the employer intentionally [retaliated] against the employee" for engaging in protected activity.  Brady v. Office of Sergeant of Arms, 520 F.3d at 494. "The court can resolve that question in favor of the employer based either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of [his] case." Taylor v. Solis, 571 F.3d at 1320 n.12; see also Smith v. District of Columbia, 430 F.3d at 455.  In this case, plaintiff's claims of retaliation are based on his PIP placement in June 2003 and his termination from the SBA in May 2004.

Mr. Kelly's contact with an EEO Counselor in June 2003, see supra at 16, and the filing of individual and class race discrimination claims are undisputedly protected activity.  See PX 29; PX 30.[22]  Regarding the question whether plaintiff suffered a materially adverse action, the "scope of the anti-retaliation provision extends beyond the workplace-related or employment-related retaliatory acts and harm." Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 67 (2006).

---

[22]     Despite their centrality to plaintiff's case at trial, defendant correctly argues that plaintiff's numerous union grievances do not constitute protected activity because they do not allege discrimination outlawed by Title VII.  See Ramey v. Potomac Electric Power Co., 468 F. Supp. 2d 51, 59-60 (D.D.C. 2006) ("[T]he union grievance filed by plaintiff is not categorically protected, but may be considered protected activity if it alleges discrimination or another practice made unlawful under Title VII."); Welzel v. Bernstein, 436 F. Supp. 2d 110, 122-23 (D.D.C. 2006) (employee's complaints about her supervisor's unprofessional and abusive behavior do not constitute protected activity without an allegation that employer violated Title VII).  Plaintiff still engaged in protected activity, however, because in addition to these union grievances, he contacted an EEO Counselor in June 2003 and filed EEO charges in October 2003.  See supra at 16; PX 29; PX 30.

> "Adverse actions" in the retaliation context encompass a broader
> sweep of actions than those in a pure discrimination claim. Due to
> differences in the language and purposes behind Title VII's retaliation
> and discrimination provisions, the Supreme Court clarified in
> Burlington [N. & Santa Fe Ry Co. v. White], 548 U.S. 53, that the
> requirements are distinct: Retaliation claims are "not limited to
> discriminatory actions that affect the terms and conditions of
> employment" and may extend to harms that are not workplace-related
> or employment-related so long as "a reasonable employee would have
> found the challenged action materially adverse." Id. at 64, 68.

Baloch v. Kempthorne, 550 F.3d 1191, 1998 n. 4 (D.C. Cir. 2008).  An action is adverse if it

likely would have "dissuaded a reasonable worker from making or supporting a charge of

discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 60 (internal quotations

omitted).

Although many of the events about which plaintiff complains are ones that a

reasonable employee would *not* have found to be materially adverse, placement on a PIP and the

termination of employment are actions that a reasonable person might well consider "material" or

"significant" or would dissuade him from engaging in further protected activity.  See Rochon v.

Gonzalez, 438 F.3d 1211, 1219 (D.C. Cir. 2006).[23]  The Court therefore will consider placement

on the PIP and plaintiff's termination as adverse actions for purposes of plaintiff's retaliation

claim.

---

[23]      This group of non-materially adverse events includes Mr. Sanchez's greetings in
Spanish, handwritten notes, invitations to Mr. Rivera to visit his office, and plaintiff's complaint
that he received an unfavorable performance evaluation in FY 2002.  See Baloch v. Kempthorne,
550 F.3d at 1199 (the following allegations do not amount to retaliation: employee's sick leave
restrictions, proposed suspensions, letters of counseling and reprimand, unsatisfactory
performance review, and alleged verbal altercations with supervisor).  As discussed supra at 23-
24, plaintiff has not explained how these events caused him *any* harm, much less how they would
have dissuaded a reasonable employee from making or supporting a discrimination charge.

30

1. Plaintiff's PIP as Retaliation

Plaintiff's claim that placing him on the PIP was the result of retaliation fails because defendant has shown a legitimate, non-retaliatory explanation for its implementation — that plaintiff's job performance had deteriorated over the course of several years and that it needed to improve. Plaintiff loses on this claim because he has not shown that defendant's performance-based reason was pretextual.  See Brady v. Office of Sergeant of Arms, 520 F.3d at 494.

The overwhelming testimony revealed that concerns about plaintiff's job performance did not arise overnight.  The letter to plaintiff, dated June 11, 2003, set forth in detail the reasons that plaintiff was placed on the PIP.  See PX 13; DX 3; see also supra at 15. His performance in three out of five critical elements by which his work was evaluated was rated "unsuccessful."  See DX 3.  Multiple customers whose applications had been assigned to plaintiff complained that he was unresponsive to their inquiries and that their applications had languished under plaintiff's review.  Id.  The letter also explained that plaintiff failed to screen and process a significant number of applications in a timely fashion, despite several occasions where he received supervisory assistance in managing his workload.  Id.  Moreover, several supervisors, who independently observed plaintiff's work over the course of several years, expressed serious concerns with his performance as early as his performance evaluation in FY 2001.  See PX 5. Later evaluations as well as email messages from customers further support defendant's nonretaliatory explanation for placing plaintiff on the PIP.

Plaintiff has failed to present sufficient evidence that this non-retaliatory explanation was pretextual.  Plaintiff's only argument that the PIP was retaliatory is based on the

Case 1:05-cv-00900-PLF   Document 63   Filed 01/06/10   Page 32 of 37

alleged temporal proximity between his protected activity and the PIP. Specifically, plaintiff

claims that Mr. Sanchez decided to implement the PIP after learning of his EEO activity and then

backdated the letter to indicate that Mr. Sanchez and Mr. Kelly discussed the PIP at their meeting

on June 11, 2003.[24] The record simply does not support plaintiff's claim for two reasons: first,

there is absolutely no evidence in the record, direct or circumstantial, to support the assertion of

backdating; all that exists is plaintiff's counsel's unsupported argument (see supra at 14 n. 17);

and second, as the Court has found as a fact, Mr. Sanchez learned about the EEO contact at some

point *after* the meeting on June 11, 2003, where he allegedly implemented the PIP. See supra at

17. Accordingly, plaintiff's claim that the PIP was the result of retaliation fails. See Smith v.

District of Columbia, 430 F.3d at 455.

## 2. Plaintiff's Termination as Retaliation

At trial, the defendant offered undisputed, credible evidence that plaintiff's poor

job performance was the reason for his termination. As discussed supra at 7, plaintiff's job

performance began to deteriorate as early as 2001, see PX 5, and got worse over the months and

years leading up to his placement on the PIP on June 11, 2003. See PX 7, PX 11. The

termination letter given to plaintiff on May 12, 2004, nearly a year later, offers additional

examples of plaintiff's unacceptable job performance, including more complaints from

---

[24] To summarize the relevant chronology, plaintiff contacted the EEO counselor on June 5, 2003. The PIP letter was dated June 11, 2003, and Mr. Sanchez met with plaintiff on June 11, 2003, for a mid-year evaluation. Mr. Sanchez was interviewed by an EEO Counselor on August 13, 2003. As his sole evidence that the PIP placement was retaliatory, plaintiff relies on his own testimony that Mr. Sanchez did not mention the PIP to him during their June 11, 2003, meeting. According to plaintiff, he first learned of the PIP when he found a copy on his desk on June 26, 2003.

applicants and more tardy applications.  See DX 4.  In plaintiff's testimony at trial, he failed even

to address the alleged reasons for his termination, instead emphasizing his own conclusory

observations and assessments of Mr. Sanchez's behavior.

        The Court is further persuaded that no pretext exists by the fact that supervisors

other than Mr. Sanchez — specifically, Mr. King and Mr. Cornelius, who, like plaintiff, also are

African-American — and representatives from the Office of Human Resources participated in

and approved of the decision to terminate Mr. Kelly.  Even if Mr. Sanchez had felt inclined to

retaliate against plaintiff after learning of the discrimination claims filed against him, he did not

wield unbridled and unilateral power over the SBA's employment decisions.  Several supervisors

more senior than Mr. Sanchez had personally observed Mr. Kelly's work and approved the

termination decision.  Morever,  in terminating plaintiff's employment, the SBA followed

detailed procedures that had been set forth by the Office of Human Resources.  See DX 7.

Plaintiff directly appealed his termination to Mr. King, and after carefully reviewing plaintiff's

mostly procedural challenges — such as his claim that he did not receive the termination until

several weeks after the meeting — Mr. King determined that the termination was justified.

Indeed, Mr. Sanchez, Mr. Cornelius, and Mr. King each independently concluded that plaintiff's

performance had been unsatisfactory for some time, and they each expressed specific, legitimate

reasons for their conclusions.  The Court concludes that defendant had a legitimate, non-

discriminatory reason for terminating plaintiff's employment.

        Plaintiff has not demonstrated to the Court that defendant's performance-based

explanation was pretextual and that his termination was the result of retaliation.  Plaintiff's

arguments can be reduced to recitations of events which he believes show pretext and retaliatory intent but, in the Court's view, do not.

Plaintiff first suggests that the comparison of his mid-year performance evaluation in June 2003 with the annual FY 2003 evaluations for other BOS employees, see PX 22, shows that Mr. Sanchez used his subjective judgment to rate several of his colleagues higher than the rating guidelines indicated they deserved.  None of the other employees who failed to meet the requirements were placed on a PIP or terminated.  Plaintiff complains that Mr. Sanchez applied objective standards to plaintiff's performance but used subjective standards to assign ratings to other employees.  In his testimony, Mr. Sanchez explained that instead of relying exclusively on the objective guidelines, he calculated office averages for the length of time it took for the entire BOS staff to screen and process applications.  He then assessed an individual BOS's performance relative to the office average.

The Court is persuaded by this explanation.  To begin with, plaintiff presented no evidence that the rating guidelines were mandatory or that it was inappropriate for Mr. Sanchez to use office averages in assigning ratings.  Performance evaluations over the course of several years also indicate that office averages were routinely used to assess individual employee performance.  See, e.g., PX 7.  The bottom line is that plaintiff's performance failed to meet either the performance criteria or to fall within the relevant averages for a satisfactory performance, supporting defendant's non-discriminatory explanation for plaintiff's termination.

Plaintiff next argues that he was prevented from attending a training opportunity in April 2004 and that this incident helps to establish Mr. Sanchez's retaliatory tendencies.  First, there is no evidence that Mr. Sanchez had anything to do with organizing the training

opportunity.  In fact, Mr. Cornelius testified that he organized the training.  Second, Mr.

Cornelius testified that plaintiff not only failed to respond to the invitation to the training and to

reserve a seat in the van, but that he also declined Mr. Cornelius' offer that plaintiff drive himself

and be reimbursed for gas and mileage.  The Court found Mr. Cornelius' testimony credible, <u>see</u>

<u>supra</u> at 19, and rejects the argument that Mr. Kelly was prevented from attending the training as

proof of his retaliation claim.

Finally, plaintiff argues that the PIP itself and Mr. Sanchez's behavior during the

PIP period demonstrate pretext and retaliatory intent.  Plaintiff argues that the burdensome nature

of the terms of his PIP suggests retaliation.  <u>See</u> DX 3.  The PIP requirements, however, were

identical to the generally applicable standards for BOSs except that some elements, such as the

number of times "supervisory intervention" would be allowed, were pro-rated to reflect the fact

that the PIP covered a 120-day period rather than a full year.  <u>Id</u>.  Contrary to Mr. Kelly's

testimony, the PIP acknowledged that tardiness would be tolerated under circumstances with

"adequate justification."  <u>Id</u>.

The fact that Mr. Sanchez implemented the PIP on June 11, 2003 and did not

schedule a formal meeting with plaintiff until August 6, 2003, despite statements in the PIP letter

that he would meet with plaintiff "bi-weekly," suggests that in this respect at least Mr. Sanchez

may not have been a model supervisor.  Specifically, Mr. Sanchez placed plaintiff on a PIP,

which imposed stringent performance requirements and left him little room for error.  After

doing this, he waited nearly two months to schedule a meeting with plaintiff to evaluate his work

or offer an appraisal of whether plaintiff was adequately fulfilling the terms of the PIP.  When

plaintiff returned from medical leave and completed the 120-day PIP period, Mr. Sanchez never

informed plaintiff that he had failed the PIP and that he planned to propose his termination.  Mr. Sanchez also admitted to being "extremely frustrated" and raising his voice at plaintiff at their meeting on August 6, 2003, because plaintiff brought his union representative, Ms. Johnson, to the meeting.  This may have been unreasonable or unprofessional conduct, as was Mr. Sanchez's action in sending a letter of reprimand to plaintiff while he was home on sick leave.  But however inappropriate some of this conduct may have been, it is not enough to satisfy plaintiff's burden of demonstrating that the defendant's performance-based reason for his termination was pretextual.

### III.  CONCLUSION

The Court denied defendant's motion for summary judgment because there were "genuine issues of material fact in dispute with respect to Mr. Kelly's claims of unlawful retaliation and discrimination on the basis of race under Title VII."  Kelly v. Hairston, 605 F. Supp. 2d at 178.  But as the finder of fact at trial, the Court had an opportunity to assess the credibility of all the witnesses and to test plaintiff's assertions through the crucible of direct and cross-examination of those witnesses.  Plaintiff's testimony, and that of his witnesses, failed to show that race or plaintiff's participation in protected activity "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 141 (brackets in original).  It "is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs." Crockett v. Richardson, 127 F. Supp. 2d 40, 47 (D.D.C. 2001); see Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting Dale v. Chicago Tribune, Co., 797 F.2d 458, 464 (7th Cir.

1986) (internal quotation marks omitted) (federal court not "a super-personnel department that examines an entity's business decisions").  Defendant presented credible evidence that demonstrated that plaintiff was placed on a PIP and terminated from the SBA because of his unacceptable job performance.  Accordingly, the Court will enter judgment for the defendant. An appropriate Order will issue this same day.

_____SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  January 6, 2010

_____